KILLINGSWORTH *v.* TATUM.

4-6530                                                             157 S. W. 2d 30

Opinion delivered December 15, 1941.

*Shouse & Shouse,* for appellant.

*M. A. Hathcoat,* for appellee.

HOLT, J.   March 6, 1941, appellants sued appellees in the Boone chancery court to enforce specific performance of an option contract to purchase a tract of land in Boone county, Arkansas, described as follows: "The west one-half (W½) of the northeast quarter (NE¼),

except three acres in the northwest corner of the northwest quarter (NW¼) of the northeast quarter (NE¼); the west half (W½) of the northeast quarter (NE¼) of the northeast quarter (NE¼); the southeast quarter (SE¼) of the northeast quarter (NE¼); the northeast quarter (NE¼) of the southeast quarter (SE¼), except one acre in the southeast corner thereof, all in section thirty-one (31), township twenty-one (21) north, range eighteen (18) west, of the fifth principal meridian in Arkansas, containing one hundred seventy-six (176) acres more or less.''

The option contract, which was made a part of the complaint, was executed January 17, 1940. Under its terms appellees, for a valuable consideration, agreed upon conditions specified therein to sell, and to convey fee simple title to appellants. The purchase price was $3,500. Among other things, the option contained the following provisions:

''2. This option is given to enable the buyer to obtain a loan from the United States acting by and through the Secretary of Agriculture (hereinafter called the 'Government'), pursuant to Title I of the Bankhead-Jones Farm Tenant Act, for the purchase of said lands. . . .

''8. This option may be exercised by the buyer, by mailing or telegraphing, within three months from the date hereof, a notice of the acceptance of the offer herein to W. A. Tatum at Lead Hill, in the city of............................ ......, state of Arkansas.''

Appellees, after admitting the execution of the option contract, interposed the following defenses (quoting from appellees' brief): ''(a) The option contract was renounced by the appellants, by their declared intentions not to perform. (b) That there was no renewal or substituted contract thereafter made by the parties thereto with reference to said matter. (c) That no notice of appellants' acceptance of the option contract was given until after appellants had renounced said option contract and that no notice of appellants' acceptance was ever given except oral notice, and not in compliance with

terms of said option. (d) That any renewal or substituted contract by parol, would be within the Statute of Frauds, and invalid and unenforceable.''

Upon a trial, the court found the issues in favor of appellees and dismissed appellants' comp'aint for want of equity. Appellants have appealed to this court where the cause is tried *de novo*.

Appellees contend that there was no written notice of acceptance given by appellant, Killingsworth, to appellee, Tatum, within the 90-day period stipulated in the contract, and also that appel'ants abandoned and rejected the option contract, and so notified appellees, thus relieving them of its conditions.

Appellants, on the other hand, insisted below and contend here that written notice was given by them to appellees of their intention to purchase the land in question, and that they did not notify appellees that they had abandoned and rejected their rights to purchase under the option contract.

We consider, first, the question: Was written notice of acceptance by appellants delivered to appellees? After a review of the record before us, we have reached the conclusion that a preponderance of the testimony is to the effect that written notice, as contemplated in the option contract, was given appellees.

It will be observed that the option contract was executed January 17, 1940, and expired 90 days thereafter. Appellant, Killingsworth, testified that on April 9, 1940, he executed his acceptance on a regular form of the Farm Security Administration in Harrison, Arkansas, put it in an envelope, and in company with his wife, Ward and Willard Chaney, drove to the home of appellee, Tatum; that he and Willard Chaney got out of his car and walked about 100 yards to the barn of Tatum, and in the presence of Willard Chaney, his brother-in-law, delivered the notice to Tatum; and that on that occasion be discussed with Tatum delivery of possession and about arrangements for Tatum to remain upon the place until he could arrange to vacate; that Tatum told him he would go in the next day and fix up the papers and wind up

the deal. Tatum did not intimate that he was not obligated on the option contract, nor did he say anything about its having been abandoned by appellants.

Willard Chaney, who was present corroborated Killingsworth's testimony.

Ward Chaney testified that he went with Mr. and Mrs. Killingsworth to the Tatum home on the occasion in question, but that he and Mrs. Killingsworth stayed in the car while Killingsworth and Willard Chaney went to the barn to deliver the notice of acceptance to Tatum.

Lendon Chambers, rural supervisor of the Farm Security Administration at Harrison, Arkansas, testified that he in company with Miss Kay Mayden (now Mrs. Cunningham), a clerk in the Harrison office, and Mr. Porter, district supervisor (all of them being disinterested witnesses so far as this record discloses), on May 15, 1940, having learned that appellees were seeking to avoid performance of their contract, went to appellees' home to investigate; that in a conversation there ''Mr. Porter asked them the day they received notice of acceptance from Mr. Killingsworth and Mrs. Tatum stated they did and offered to go get the notice of acceptance and we told her that was not necessary. We just wanted to know for sure they did get it.''

He further testified that once or twice thereafter he met the Tatums and discussed the transaction with them and ''They told me at one time if we would guarantee the title would be clear that they would go ahead with the deal, but they did not want to be out that expense and not know for sure it would go through, and I told them I never heard of a title that could not be cleared in some way and I was sure the title could be cleared.''

Miss Kay Mayden corroborated Mr. Chambers' testimony and further stated that Mrs. Tatum said she was the one who started it, but now wanted to stay on the place because of a tragedy in the family; they admitted having received the notice of acceptance from Killingsworth and she did not hear them make any contention that they had not received the notice of acceptance.

Appellee, W. A. Tatum, admitted the execution of the option contract in question, but denied that Killingsworth delivered to him written notice of acceptance. We quote from his testimony: "A. He came. down to the barn—him and Willard Chaney and told me he had been accepted and thought he would be able to take the place. Q. Do you remember when that was? A. Along about the 9th or 10th of April—before the option was out."

And here we quote from appellees' brief: "In this, he is supported by his son, Arch Tatum, who says that he was present when Mr. Killingsworth came to his father's home, April 9, 1940; that Floyd Killingsworth did not deliver any notice in writing of any kind; that Mr. Killingsworth merely told his father, W. A. Tatum that he was accepted and could take the place; but that was after we had been notified he was rejected, and his father, W. A. Tatum, told him 'No'."

As we have indicated, we think the effect of this and other testimony, which we do not deem it necessary to abstract, preponderates in favor of appellants' contention that the required notice was given to Tatum on April the 9th, 1940.

We next consider appellants' contention that they did not notify appellees that they had abandoned the option contract. It is our view that this contention also is supported by a preponderance of the testimony.

On this point the evidence tends strongly. to show that prior to filing suit for specific performance by appellants, appellees made no contention that they were not going to carry out the option contract on the ground that appellants had renounced and abandoned same. All parties here clearly understood that Killingsworth could not purchase the land in question under the option without the aid of a government loan. On March 22, 1940, Killingsworth was informed through the local agent of the Farm Security Administration at Harrison, Arkansas, that his application for a loan would be rejected for the reason that he was not eligible to receive a loan. Upon further evidence of Killingsworth's eligibility for the loan, the loan was granted on March 26, 1940, and

appellant notified. From the record, it appears that at most the period during which there was any doubt about the loan being granted to Killingsworth was not longer than seven days, all within the 90-day period of the option. It was during this seven-day period that Killingsworth had a conversation with the Tatums in Austin's Store at Lead Hill, Arkansas, relative to his getting his application for the loan accepted. As to what took place in the conversation at Lead Hill, appellee, W. A. Tatum, testified: "Q. State to the court whether or not prior to this time you had been advised by Mr. Killingsworth that his application for a loan had been rejected, and that he would not carry out the option contract and that it was all off. A. He told me in Charley Austin's store that he was rejected. Q. Did you accept that as a renunciation? A. Yes, sir. . . . A. Yes, along the last of March he told me he was rejected. I don't know just what day." His wife was present at the time.

Mrs. Pearl. Tatum testified: "Q. Do you recall, Mrs. Tatum, having heard Mr. Floyd Killingsworth make any statement with reference to this option agreement to the effect that he was not going to be able to go through with it and was not going to go ahead? A. He told us in Mr. Austin's store. Q. Tell the court what was said. A. Mr. Hester and Miss Mayden had been down and told him he was not eligible because Mr. Chaney had too much money; that his son-in-law or children couldn't buy a farm."

Gerald Parsley testified that he was present in the Austin Store at the time and heard a conversation between Killingsworth and Mr. and Mrs. Tatum with reference to the contract and "Well—they were talking in a conversation there and he said it would be impossible for him to buy the place—as far as he was concerned the deal would be off."

Vivian Foresee, who was also present, testified that she heard the conversation and that Mr. Killingsworth said "He would not take the place," and she went on out of the store.

We quote from the testimony of Mr. Killingsworth, giving his version of the conversation in Austin's Store:

"Q.  State whether or not you told him on that occasion that you renounced the contract and recognized it as canceled.  A.  I didn't say I recognized it as canceled. Unless the government furnished the money it would have to be, but he says they were still working on it and trying to get it perfected.  . . .  Q.  Did you tell him anything the government has informed you, or did you tell him what Jess Chaney told you?  A.  Just what Mr. Chaney told me.  . . .  Q.  I thought you said you told Mr. Tatum if the government didn't go on and furnish it, you couldn't carry it out?  A.  Yes, unless the government furnished it, I couldn't go on, but I didn't say the deal was off."

We think the effect of the testimony of Mr. and Mrs. Tatum is that they understood from appellee, Killingsworth, that at the time of the conversation his application for a loan had been rejected.  They do not say that Killingsworth told them that he had abandoned or rejected the option, which had not yet expired.

We think appellees' actions following this conversation, and the delivery of notice of acceptance by Killingsworth to them on April 9, 1940, show most convincingly that they did not consider the option contract rescinded or abandoned by appellants.  Immediately following the notice on April 9, appellees went to Harrison and arranged to have their abstract brought down to date and later when an examination of the abstract disclosed the ownership of a 1/35th interest in the land to be in doubt, apparently belonging to a missing heir, they employed counsel, who filed suit and had the title perfected by a court decree rendered in January, 1941. During the time the title was being perfected, appellant had many conversations with appellees relative to the title and on each occasion appellees assured appellant that they were doing their best to perfect their title and during none of these conversations did they claim that appellant had abandoned the option contract.  On one occasion appellee asked Killingsworth to assist him in finding the missing heir and Tatum, according to Killingsworth, said in this connection:  "Let's try to get this straightened up.  Let's try to find this heir, and if we can't, let's drop the deal."  To

this suggestion, Killingsworth replied: "No, I will try to help you find the heir, but I will not drop the deal." This testimony seems not to be disputed.

Appellees' contention that they lost the opportunity to buy a farm in Oklahoma because appellants abandoned the option contract here, we think is untenable for the reason that the evidence offered by appellees, upon which to base this contention, is too indefinite and unsubstantial to support their theory of a contract to purchase land in Oklahoma. We quote here from the testimony of appellee, W. A. Tatum: "Q. You say that you had bought a farm in Oklahoma? A. I hadn't bought it—I just kinda contracted for it. Q. What kind of a contract did you have for the farm in Oklahoma? A. Just a kinda verbal contract. No written notice of any kind."

Having reached the conclusion that appellants' right to specific performance of the option contract in question is supported by a preponderance of the evidence, the decree is reversed, and the cause remanded with directions to enter a decree not inconsistent with this opinion.